IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Edward Rush, on behalf of himself and all others similarly situated in the District of Columbia, | )Case No. 05 CV 01578<br>)Judge John D. Bates<br>) |
| Plaintiff, | ) **AMENDED CLASS ACTION**<br>)**COMPLAINT**<br>) |
| vs. | )<br>)<br>) **JURY TRIAL DEMANDED** |
| MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; INFINEON TECHNOLOGIES AG; INFINEON TECHNOLOGIES NORTH AMERICA CORP; HYNIX SEMICONDUCTOR INC.; HYNIX SEMICONDUCTOR AMERICA INC.; SAMSUNG ELECTRONICS CO. LTD.; SAMSUNG SEMICONDUCTOR, INC.; NANYA TECHNOLOGY CORPORATION; NANYA TECHNOLOGY CORPORATION USA; MOSEL VITELIC INC.; MOSEL VITELIC CORPORATION; ELPIDA MEMORY INC.; ELPIDA MEMORY (USA), INC.; NEC ELECTRONICS CORPORATION; WINBOND ELECTRONICS CORPORATION; WINBOND ELECTRONICS CORPORATION AMERICA; and JOHN DOES 1-100, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## PLAINTIFF'S ADDRESS

Edward Rush
2001 First Street, N.W.
Washington, D.C. 20001


## DEFENDANTS' ADDRESSES

MICRON TECHNOLOGY, INC.
Steven R. Appleton, President
8000 S. Federal Way
Boise, ID 83707;

MICRON SEMICONDUCTOR PRODUCTS, INC.
d/b/a/ Micron
Michael W. Sadler, Chief Executive Officer
8000 S. Federal Way
Boise, ID 83716-9632;

INFINEON TECHNOLOGIES AG
Peter J. Fischl, Chief Financial Officer
Michael von Eickstedt, General Counsel and Senior Vice President
St.-Martin-Strasse 53
D-81541 Munich
Federal Republic of Germany;

INFINEON TECHNOLOGIES NORTH AMERICA CORPORATION
Jan Du Preez, Chairman
1730 North First Street
San Jose, CA 95112;

HYNIX SEMICONDUCTOR INC.
Eui-jei Woo, Chairman & CEO
San 136-1, Ami-ri, Bubal-eub
Ichon, Kyonggi 467-860
South Korea;

HYNIX SEMICONDUCTOR AMERICA INC.
Eui-jei Woo, Chairman & CEO
3101 North First Street
San Jose, CA 95134;

SAMSUNG ELECTRONICS COMPANY LTD.
Jong-Yong Yun, Vice Chairman/CEO
250, 2-ga, Taepyung-ro, Jung-gu
Seoul, 100-742
South Korea;

SAMSUNG SEMICONDUCTOR INC.
Kim, Han J., CEO
3655 North First Street
San Jose, CA 95134;

NAN YA TECHNOLOGY CORPORATION
Dr. Jih Lien, President; Dr. Pei Lin Pai, VP Sales and Global Marketing
Hwa Ya Technology Park
669, Fu Hsing 3rd Road, Kueishan
Taoyuan, Taiwan
Republic of China;

NAN YA TECHNOLOGY CORPORATION USA
Ken Hurley, President
25 Metro Drive, Suite 230
San Jose, CA 95110;

    Headquarters:
    NAN YA TECHNOLOGY CORPORATION USA
    675 E. Brokaw Rd.
    San Jose, CA 95112;

MOSEL VITELIC, INC.
Hung-Chiu Hu, Chairman
No. 19, Li Hsin Rd.
Science-Based Industrial Park
Hsinchu, Taiwan;

MOSEL VITELIC CORPORATION
3910 North First Street
San Jose, CA 95134-1501;

ELPIDA MEMORY, INC.
Yukio Sakamoto, President
2-1, Yaesu 2-chome
Chuo-ku, Tokyo
Japan;

ELPIDA MEMORY (USA) INC.
2-1, Yaesu 2-chome
Chuo-ku, Tokyo
Japan;

      Raleigh Office:
      ELPIDA MEMORY (USA) INC.
      Dan Donabedian, President & CEO
      8521 Six Forks Road, Suite 270
      Raleigh, NC 27615;

WINBOND ELECTRONICS CORPORATION
Ching-Chu Chang, President
No. 4, Creation Road 3
Science-Based Industrial Park
Hsinchu, 300, Taiwan
Republic of China

WINBOND ELECTRONICS CORPORATION AMERICA
Wen Chu, VP General & Administration
Dr. Kuang Chiu, President
2727 North First Street
San Jose, CA 95134

NEC ELECTRONICS AMERICA, INC.
Toshio Nakajima, President
2880 Scott Blvd.
Santa Clara, CA 95050-2554

Plaintiff Edward Rush ("Plaintiff"), through his attorneys, brings this civil action

for damages on behalf of himself and all others similarly situated in the District of

Columbia.  Plaintiff, upon personal knowledge as to his own acts and status, and upon

information and belief as to all other matters, alleges the following:


### INTRODUCTION

1.      This case arises out of a long-running conspiracy beginning no later than

1999, and continuing until present, among Defendants and their Co-Conspirators with the

purpose and effect of fixing prices, allocating market share, and committing other

unlawful practices designed to inflate the prices of Dynamic Random Access Memory

computer chips ("DRAM") and products containing DRAM sold indirectly to Plaintiff

and other purchasers in the District of Columbia.

2.      Defendants' conspiracy has involved illegal conduct by an international

cartel that has deliberately targeted, and severely burdened, consumers in the District of

Columbia.  The conspiracy has existed at least during the period from 1999 to the present,

and has affected billions of dollars of commerce for products commonly found in

households and businesses in the United States, including the District of Columbia.

Defendants' conspiracy has included communications and meetings in which Defendants

agreed to eliminate competition and fix the prices and allocate markets for DRAM.

3.      The charged combination, and conspiracy consisted of a continuing

agreement, understanding, and concert of action among Defendants and their Co-

Conspirators, the substantial terms of which were to fix, stabilize, and maintain prices,

allocate markets and customers, and to coordinate price increases for the sale of DRAM

in the District of Columbia.

    4.    The acts in furtherance of the conspiracy by Defendants have included,

upon information and belief,  the following wrongful conduct and horizontal agreements:

(a)    participating in meetings and conversations in which Defendants and their Co-Conspirators discussed and agreed to prices for DRAM;

(b)    participating in meetings and conversations in which Defendants and their Co-Conspirators allocated markets and customers for DRAM;

(c)    participating in meetings and conversations in which Defendants and their Co-Conspirators discussed and agreed to refrain from engaging in competitive bidding, or to submit complementary and non-competitive bids, for particular contracts to supply DRAM and products containing DRAM to various consumers;

(d)    exchanged sales and customer information for the purposes of monitoring and enforcing adherence to the agreements reached;

(e)    issuing price announcements, price quotations, and general price increases in accordance with the pricing and market allocation agreements reached; and

(f)    facilitating, effectuating, implementing, monitoring, and concealing the contract, combination, and conspiracy to raise the prices of DRAM sold.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds $5,000,000 exclusive of interest and costs when the claims of individual class members are aggregated, and is between citizens of different states. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391.  The events giving rise to the claim occurred in this judicial district.

6.    Personal Jurisdiction comports with due process under the United States Constitution.

7.    Without limiting the generality of the foregoing, Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) have:

(a)    transacted business in the District of Columbia;

(b)    contracted to supply or obtain services or goods in the District of Columbia;

(c)    intentionally availed themselves of the benefits of doing business in the District of Columbia;

(d)    produced, promoted, sold, marketed, and/or distributed their products or services in the District of Columbia and, thereby, have purposefully profited from their access to markets in the District of Columbia;

(e)    caused tortious damage by act or omission in the District of Columbia;

(f)    caused tortious damage in the District of Columbia by acts or omissions committed outside such jurisdiction while (i) regularly doing or soliciting business in such jurisdiction,

- 3 -

and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(g)     committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in the District of Columbia to Plaintiff and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(h)     engaged in a conspiracy with others doing business in the District of Columbia that caused tortious damage in the District of Columbia; and

(i)     otherwise had the requisite minimum contacts with the District of Columbia such that, under the circumstances, it is fair and reasonable to require Defendants to come to this Court to defend this action.

8.     Plaintiff Edward Rush is a resident of the District of Columbia.  In addition, a substantial part of the trade and commerce, as well as the arrangement, contract, agreement, trust, combination, conspiracy, unfair or deceptive practices, and/or uniform and common course of conduct giving rise to Plaintiff's claims, occurred within the District of Columbia, including, among other things, the indirect sale of DRAM and products containing DRAM to Plaintiff and other members of the Class at supra-competitive prices.

9.     As a result of the manufacture, distribution, delivery and sale of Defendants' products to indirect purchasers within the District of Columbia, directly or

- 4 -

through their subsidiaries, affiliates or agents, Defendants obtained the benefits of the

laws of the District of Columbia and the District of Columbia market for their products.

10.    Plaintiff does not seek any form of "common" recovery.  Furthermore,

Plaintiff's state law causes of action are not federally pre-empted.  Plaintiff states, and

intends to state, causes of action solely under the laws of the District of Columbia and

specifically denies any attempt to state a cause of action under the laws of the United

States of America, including, without limitation, the Sherman Act, 5 U.S.C. § 1 *et seq.*

## PARTIES

A.    Plaintiff

11.    Plaintiff Edward Rush is a resident of the District of Columbia who has

indirectly purchased DRAM and or products containing DRAM manufactured by one or

more Defendants during the relevant conspiracy period.

B.    Defendants

*MICRON*

12.    Defendant Micron Technology Incorporated ("Micron") is a Delaware

corporation with its principal place of business in Boise, Idaho.

13.    Defendant Micron Semiconductor Products, Inc. d/b/a Crucial Technology

("Crucial") is a wholly owned subsidiary of Micron, incorporated in Idaho with its

principal place of business in Idaho.

*INFINEON*

14.    Defendant Infineon Technologies AG ("Infineon") is a German corporation with its principal place of business in Munich, Germany.

15.    Defendant Infineon Technologies North America Corp. is a wholly owned subsidiary of Infineon, incorporated in Delaware with its principal place of business in California.

*HYNIX*

16.    Defendant Hynix Semiconductor, Inc.("Hynix") is a South Korean Corporation with its principal place of business in Ichon, South Korea.

17.    Defendant Hynix Semiconductor America, Inc. is a wholly owned subsidiary of Hynix and is incorporated in California with its principal place of business in California.

*SAMSUNG*

18.    Defendant Samsung Electronics Company, Ltd. ("Samsung") is a Korean Corporation with its place of business and executive offices located in Seoul, Korea.

19.    Defendant Samsung Semiconductor, Inc. is a wholly owned subsidiary of Samsung and is incorporated in California with its principal place of business in California.

*NANYA*

20.    Defendant Nanya Technology Corporation ("Nanya") is a Taiwanese Corporation with its headquarters located in Linko, Taiwan.

21.    Defendant Nan Ya Technology Corporation USA is a wholly owned subsidiary of Nanya and is incorporated in California with its principal place of business in California.

### *MOSEL VITELIC*

22.    Defendant Mosel Vitelic, Inc. ("Mosel") is a Taiwanese Corporation with its  principal place of business in Hsinchu, Taiwan, R.O.C..

23.    Defendant Mosel Vitelic Corporation is a wholly owned subsidiary of Mosel and is incorporated in California with its principal place of business in California.

### *ELPIDA MEMORY INC.*

24.    Defendant Elpida Memory Inc. ("Elpida") is a Japanese Corporation with its principal place of business in Tokyo, Japan.  Elpida is a 50:50 joint venure between NEC and Hitachi.

25.    Defendant Elpida Memory (USA), Inc. Is a wholly owned subsidiary of Elpida Memory Inc. And is incorporated in Delaware with its principal place of business in California.

### *NEC ELECTRONICS AMERICA, INC.*

26.    Defendant NEC Electronics America, Inc. ("NEC") is a wholly owned subsidiary of NEC Electronics Corporation and is incorporated in California with its principal place of business in California.

*WINBOND ELECTRONICS CORPORATION*

27.    Defendant Winbond Electronics Corporation ("Winbond) is a Taiwanese Corporation with its principal place of business in Hsinchu, Taiwan, R.O.C.

28.    Defendant Winbond Electronics Corporation America is a wholly owned subsidiary of Winbond and is incorporated in Deleware, with its principal place of business in California.

*ADDITIONAL DEFENDANTS*

29.    As additional information may come to light, Plaintiff reserves the right to add defendants as they become known to him.

30.    The acts alleged in this Complaint were, upon information and belief, authorized, ordered or done by officers, agents, employees, or representatives of each Defendant while actively engaged in the management of its business or affairs.

## CO-CONSPIRATORS

31.    Various other individuals, partnerships, corporations, organizations, firms, and associations not yet made defendants in this Complaint (the "Co-Conspirators") and presently unknown to Plaintiff, participated as co-conspirators in the violation alleged herein, and performed acts and made statements in furtherance of the conspiracy.

32.    The true names and capacities, whether individual, corporate, associate, representative, or otherwise of defendants named herein as DOES 1 through 100 are unknown to Plaintiff at this time, and are therefore sued by such fictitious names.

Plaintiff will amend this complaint to allege the true names and capacities of DOES 1

through 100 when they become known to Plaintiff.  Each of DOES 1 through 100

is in some manner legally responsible for the violations of law alleged herein.

33.    The acts charged in this Complaint as having been done by Defendants and

the DOE defendants were authorized, ordered, or done by their officers, agents,

employees, or representatives, while actively engaged in the management of the

defendants' businesses or affairs.

## CLASS ACTION ALLEGATIONS

34.    This action is brought by Plaintiff on behalf of himself, and pursuant to Fed.

R. Civ. P. Rule 23, as representative of a class (the "Class").  In particular, Plaintiff

asserts that a class action is appropriate under Fed. R. Civ. P.  23(b)(3).

35.    The Class is defined as:

> All persons or entities present in the District of Columbia who
> indirectly purchased DRAM or products containing DRAM
> manufactured by any Defendant or Co-Conspirators from at
> least 1999 to the present. The class of indirect purchasers of
> these products includes consumers and businesses who have
> purchased DRAM and/or products containing DRAM.
> Excluded from the class are all governmental entities,
> Defendants and their subsidiaries and affiliates.

36.    Although the exact size of the class is unknown, the total number of class

members is in the millions as virtually all consumers have purchased DRAM and/or

products containing DRAM.  Based upon the nature of the trade and commerce involved,

the total number of class members is such that joinder of all Class members would be impracticable.

37.    The claims of Plaintiff are typical of the claims of the Class, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has no conflict with any other Class member and has retained competent counsel experienced in class action and antitrust litigation.

38.    Common questions of law and fact exist, including:

(a)    whether Defendants conspired with each other and others to fix, raise, stabilize or maintain the prices of DRAM;

(b)    whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class, and if so, the appropriate measure of damages; and

(c)    whether Defendants actively concealed the violation alleged herein.

These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

39.    Class action treatment is a superior method for the fair and efficient adjudication of  the controversy described herein.  The class action vehicle provides an efficient method for enforcement of the rights of Plaintiff and class members, and such litigation can be fairly managed.  Plaintiff knows of no unusual problems of management or notice.

## DRAM

40.    DRAM is the most commonly used semiconductor memory product.  DRAM provides speed storage and retrieval of electronic information for computers, telecommunication products and consumer electronics.  DRAM is characterized as a commodity and Defendants' DRAM products are freely interchangeable with those of the other Defendants.

41.    DRAM is a necessary component in a variety of electronic products, including computer servers and personal computers.  It is also a component in digital video recorders, video game equipment, printers, fax machines and personal digital assistants.

42.    Worldwide sales of DRAM totaled approximately $14 billion in 2001, and are projected to reach $17.6 billion in 2004.  The United States is expected to account for close to 30% of the total market in 2004, remaining the largest purchaser of DRAM.  Currently, half of the total worldwide DRAM supply is controlled by Samsung and Micron.  Along with these two companies, Infineon Technology, Hynix Semiconductor, and Nanya Technology, make up 82% of the market worldwide.

43.    An agreement was reached in 1999 between the co-conspirators to do "bench marking" of the "price-cost-availability" of an alternative memory chip.

44.    Excessive consolidation occurred in DRAM manufacturing from the mid-1990s to 2002, leading to 40% fewer manufacturers in the DRAM market.

- 11 -

45.     In the fall of 2001, Defendants agreed to reduce supply in order to artificially raise prices.  By agreeing to cut production, the Defendants' wanted to ensure that the prices in DRAM would increase in relation to the supply decrease.

46.     At a meeting amongst Defendants in the fall of 2001, Mosel Vitelic's vice chairman reportedly stated, "a basis for understanding had been reached" in which the Co-Conspirators were to "trim some production starting in September."  Furthermore, Mosel Vitelic had allegedly "agreed with rivals [to] restrict spot market sales, aiming to boost chip prices" to above $3 per chip.

47.     In an e-mail referring to Micron's decision to raise prices and discussing the effects this raise would have on the DRAM marketplace, a Micron manager allegedly states that "the consensus from all suppliers is that if Micron makes the move all of them will do the same and make it stick."  In the months following this reported e-mail, prices of DRAM did rise in the marketplace.

48.     Mosel's Vice President Thomas Chang was reported in both the Detroit News on May 16, 2002 and in the Taipei Times on May 17, 2002, as having confirmed Defendants' ability to fix the price of DRAM.  The reports state that Mosel Vitelic, Inc. agreed with rivals to restrict spot market sales, in an attempt to increase chip prices and encourage a price of $3 for DRAM chips.  Chang expressed that no formal meetings took place, but rather, the Defendants communicated their agreement not to sell below $3 by telephone.

49.     In December of 2001, a DRAM chip was selling for less than $1.  By the end of May 2002, the price for a single DRAM chip exceeded $4, with a high of $4.80 per chip in the first quarter of 2002.

50.     On June 18, 2002, Micron announced it had been cooperating with the Department of Justice ("DOJ") antitrust investigation of the DRAM industry.  Micron has disclosed that it had received a subpoena issued by a grand jury in the Northern District of California.

51.     On June 20, 2002, Samsung, Hynix and Infineon confirmed that they had received subpoenas from a grand jury.

52.     On September 15, 2003, Elpida and NEC confirmed that they had received subpoenas from a grand jury investigating manipulation of the DRAM market.

53.     In December 2003, Alfred P. Censullo, former Micron sales manager, plead guilty to a single count of obstruction of justice in the Justice Department Investigation.

54.     On September 15, 2004, Infineon agreed to plead guilty and pay a $160 million criminal fine to charges alleging that Infineon participated in the conspiracy to fix prices and allocate customers in the DRAM industry.

55.     On November 11, 2004, Micron's CEO Steve Appleton, admitted that "the DOJ's investigation has revealed evidence of price fixing by Micron employees and its competitors on DRAM sold to certain computer and server manufacturers."

56.     Infineon states in its press release that it operates in the United States from San Jose, California.  Former Infineon executives work at Infineon North America.  Infineon

North America has access and control over documents concerning certain chips in the possession of Infineon. Infineon and Infineon North America share databases with a variety of topics and records. Infineon North America can obtain high level documents concerning the marketing of certain chips from Infineon.

57.    On December 2, 2004, four Infineon employees agreed to plead guilty to participation in an international conspiracy to fix prices in the DRAM market. Heinrich Florian, Gunter Hefner, Peter Schaefer, and T. Rudd Corwin all plead guilty to a one-count felony charge and each agreed to pay a $250,000 criminal fine and serve prison terms ranging from four to six months for their actions.

58.    On April 21, 2005, Hynix agreed to plead guilty and pay a $185 million criminal fine to charges alleging that Hynix participated in the conspiracy to fix prices and allocate customers in the DRAM industry.

## <u>TRADE AND COMMERCE</u>

59.    The activities of Defendants and Co-Conspirators, as described herein, were within the flow of, and were intended to, and did have a substantial effect on the commerce of products containing DRAM in the District of Columbia.

60.    During the time encompassed by the violations alleged, Defendants sold and shipped substantial quantities of DRAM and/or products containing DRAM to manufacturing businesses in the District of Columbia and elsewhere. Those businesses incorporated the DRAM into other products including, but not limited to, personal computers, computer workstations, computer servers, fax machines, printers, network

equipment and digital video recorders, and then sold those goods to consumers and businesses in the District of Columbia and elsewhere.

61.     The contract, combination, and conspiracy consists, upon information and belief, of a continuing agreement, understanding, and concert of action between and among Defendants and their Co-Conspirators, the substantial terms of which were and are to fix, stabilize, and maintain prices, allocate markets and customers, and to coordinate price increases for the sale of DRAM in the District of Columbia and elsewhere.

62.     The acts in furtherance of the conspiracy by Defendants have included, on information and belief, the following wrongful conduct and horizontal agreements:

    (a)    participating in meetings and conversations on a periodic basis since at least 1999, in which Defendants and their Co-Conspirators discussed and agreed to fix, raise, stabilize, and maintain the prices for DRAM;

    (b)    participating in meetings and conversations on a periodic basis since at least 1999, in which Defendants and their Co-Conspirators discussed and agreed to allocate markets and customers for DRAM;

    (c)    participating in meetings and conversations on a periodic basis since at least 1999 in which Defendants and their Co-Conspirators discussed and agreed to refrain from engaging in competitive bidding, or to submit complementary and non-competitive bids, for particular contracts to supply DRAM to various customers;

    (d)    exchanged sales and customer information for the purposes of monitoring and enforcing adherence to the agreements reached;

(e)     issuing price announcements, price quotations, and general
        price increases in accordance with the pricing and market
        allocation agreements reached; and

(f)     facilitating, effectuating, implementing, monitoring and
        concealing the contract, combination, and conspiracy to raise
        the prices of DRAM sold.

63.     For the purposes of formulating and effectuating the aforesaid contract,

combination, and conspiracy, Defendants and their Co-Conspirators did those things

which they conspired to do.

## IMPERMISSIBLE MARKET EFFECTS

64.     The contract, combination, and conspiracy alleged herein had the following

effects, among others:

(a)     prices paid by Plaintiff and other Class Members for DRAM and
        products containing DRAM were fixed, raised, maintained, and
        stabilized at artificially high and noncompetitive levels;

(b)     indirect purchasers of DRAM and products incorporating
        DRAM were deprived of the benefits of free and open
        competition; and

(c)     competition between and among Defendants and their co-
        conspirators in the sale of DRAM was unreasonably restrained.

65.     As a result, Plaintiff and the members of the Class have been injured in their

business and property in that they paid more for products containing DRAM than they

otherwise would have paid in the absence of Defendants' unlawful contract, combination,

and conspiracy.

## FRAUDULENT CONCEALMENT

66.     Throughout the Class Period, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

67.     Defendants and their Co-Conspirators engaged in a successful, illegal price-fixing conspiracy that was by its nature self-concealing.

68.     Defendants' wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, and which, in fact, successfully precluded detection.  Although Plaintiff exercised due diligence throughout the Class Period, he could not have discovered Defendants' unlawful scheme and conspiracy at any earlier date, because of Defendants' effective, affirmative, and fraudulent concealment of their activities.

69.      Defendants periodically withheld supply of DRAM and other memory components to create an artificial supply shortage, generating a level of artificial demand to drive up prices, while publicly stating that the wild price fluctuations were due merely to seasonal swings and to the usual uptick in PC demand as corporations spent out their IT budgets for the year.

70.     Defendants used other means of communication that were designed and intended to avoid detection, including numerous telephone calls among the conspirators.

71.     Defendants communicated to their United States entities false reasons to explain price increases, such as seasonal ebb and flow and a highly competitive market,

and instructed them to use these false reasons with U.S. customers.   Plaintiff and other members of the Class had no reason to disbelieve Defendants' explanations of the pricing behavior of these products.  Indeed, in some instances Defendants' explanations involved proprietary or otherwise non-public information within Defendants' control, leaving Plaintiff and members of the Class without means to verify their accuracy.  In fact, Defendants' prices for DRAM were artificially inflated and maintained by virtue of Defendant's illegal price-fixing conspiracy; Plaintiff and the other members of the Class were paying higher prices for DRAM than they would have paid in a competitive market.

72.    Plaintiff has exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy, and by seeking discovery as to the matters asserted herein, to the extent permitted by law.

## COUNT I
### (Violation of the District of Columbia Antitrust Act)

73.    Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as if fully set forth herein.

74.    Beginning at least in 1999, the exact date being unknown to Plaintiff, and continuing thereafter up to and including the date of the filing of this Complaint, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in unreasonable restraint of trade and commerce in violation of the District of Columbia Antitrust Act, D.C. Code  § 28-4501 *et seq.*

75.    During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, conspired with others named as Defendants herein to, and did, set prices and allocate markets pursuant to illegal agreements to fix, maintain or stabilize prices of DRAM sold and/or distributed in the District of Columbia.  This horizontal price-fixing conspiracy restrained trade or commerce in the District of Columbia, and were designed to have, and did have, a substantial and adverse impact on prices for DRAM in the District of Columbia.

76.    This unlawful horizontal price-fixing conspiracy in restraint of trade or commerce in the DRAM industry has caused, and continues to cause, substantial injury and damage to Plaintiff, the Class and the public throughout the United States, including the District of Columbia.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, and respectfully requests the Court:

1.    Certify this action to proceed as a class action pursuant to Fed. R. Civ. P. 23 and direct that reasonable notice be given to members of the Class;

2.    Adjudge and decree that Defendants and each of them engaged in an unlawful contract, combination, and conspiracy in restraint of trade or commerce in violation of the D.C. Code § 28-4501 *et seq.* granting standing to indirect purchasers for antitrust injuries, and that the Court award Plaintiff and the Class (i) actual damages in an amount to be proved at trial as a result of the wrongful conduct alleged, plus interest and

costs; (ii) treble damages under the District of Columbia Antitrust Act; and (iii) all other damages available under the laws of the District of Columbia;

3.    Award Plaintiff the costs of the suit, including reasonable attorney's fees; and

4.    Grant such other, further or different relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims for which he is entitled to a jury trial.


Dated:        August 8, 2005


Respectfully submitted,


_____
Jeffrey A. Bartos
D.C. Bar No. 435832
Jonathan P. Rolfe
D.C. Bar No. 474296
**GUERRIERI, EDMOND, CLAYMAN & BARTOS P.C.**
1625 Massachusetts Avenue, N.W.
Suite 700
Washington, DC 20036
(202) 624-7400


- 20 -

**STRAUS & BOIES, LLP**
David Boies, III
Timothy D. Battin
Ian Otto
4041 University Dr.
5th Floor
Fairfax, Va. 22030
Tel: (703) 764-8700
Fax: (703) 764-8704

**DURRETTEBRADSHAW, PLC**
Wyatt B. Durette, Jr.
Christine Williams
Main Street Center
600 East Main Street
Twentieth Floor
Richmond, VA  23219
Tel:  (804) 775-6809
Fax: (804) 775-6911

**GUSTAFSON GLUEK, PLLC**
Daniel R. Gustafson
Renae D. Steiner
725 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

**HULETT HARPER STEWART, LLP**
Dennis Stewart
550 West C Street, Suite 1600
San Diego, CA 92101
Tel: (619) 338-1133

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC**
Andrew S. Friedman
Francis J. Balint, Jr.
Patrick J. Van Zanen
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Tel: (602) 274-1100

**LaFOLLETTE GODFREY & KAHN, SC**
Kevin J. O'Connor
Patricia J. Kaeding
Paul J. Stancil
One East Main Street
P.O. Box 2719
Madison, WI 53701-2719
Tel: (608) 284-2600

**FREEDMAN BOYD DANIELS HOLLANDER & GOLDBERG, PA**
David A. Freedman
Joseph Goldberg
20 First Plaza, Suite 700 (87102)
PO Box 25326
Albuquerque, NM 87125
Tel: (505) 842-9960

**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**
Michael Simon
Kevin Pearl
337 Penco Road
Weirton, WV 26062
Tel: (304) 723-4400